**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

NORIX GROUP, INC., )
)                    Case No. 17-cv-07914
         Plaintiff, )
)
       v. )
)                    Judge John Robert Blakey
CORRECTIONAL TECHNOLOGIES, )
INC., d/b/a CORTECH USA, and VDL )
INDUSTRIES, LLC, d/b/a AMERICAN )
SHAMROCK, )
)
        Defendants. )

**MEMORANDUM OPINION AND ORDER**

This patent infringement action comes before this Court for a second round of claim construction.  Having reviewed the parties' briefs and submissions on claim construction, as well as the asserted patent (including the amended and new claims, the specification, and the new prosecution history), and having considered the evidence and arguments submitted at the supplemental claim construction hearing held January 31, 2024, the Court now issues this supplemental claim construction memorandum opinion and order.

**A.     Background & Procedural History**

**1.     The '933 Patent and Claims**

Plaintiff, Norix Group, Inc., owns U.S. Patent No. 9,661,933 (the '933 Patent), entitled "Intensive Use Bed."  As originally issued, the '933 Patent consisted of three independent claims (claims 1, 12, and 15).  [31-1] at 20.  On March 10, 2020, this Court issued its first claim construction decision, construing ten disputed claim

terms. *See* [109].

Defendants, Correctional Technologies, Inc. d/b/a Cortech USA and VDL Industries, LLC, d/b/a American Shamrock, requested a first *ex parte* reexamination with the United States Patent and Trademark Office ("USPTO") on May 26, 2020, after this Court issued its first claim construction decision. While the first *ex parte* reexamination was pending, Defendants requested a second *ex parte* reexamination on September 7, 2021 (together, the "reexamination proceedings"). The USPTO issued a single *ex parte* reexamination certificate, US 9,661,933 C1, on September 15, 2023. [211] at 13–14. As a result, the USPTO confirmed the patentability of the original claims 1–8, 10–11, and 14, amended claims 12, 13, and 15, and added new claims 16–19. *Id.* at 14. The USPTO did not reexamine claim 9. *Id.*

Currently the '933 Patent consists of four independent claims (claims 1, 12, 15, and 16); plus numerous dependent claims: claims 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, which depend from claim 1; claims 13 and 14, which depend from claim 12; and claims 17, 18, and 19, which depend from claim 16. [211-6] at 198–202. The operative complaint alleges that Defendants' Endurance Bed and Endurance Bed 2.0 "include all of the elements of at least Claim 1, Claim 12, and Claim 15 of the '933 Patent" and thus infringe the patent. [31] ¶ 81.

In its briefing, Plaintiff provided a visual breakdown of the asserted claims and their elements. [214-1], which is included below, with disputed terms highlighted in yellow and amended terms redlined.

**ASSERTED CLAIMS OF THE '933 PATENT**

Claim 1 (disputed claim terms highlighted in yellow)

| |
|---|
| 1. An intensive use bed comprising: |
| a molded outer shell having |
|     a top surface, |
|     bottom surface, |
|     a pair of end walls, |
|     a first side wall and a second side wall, |
|     a support surface on the top surface, |
|     a ridge surrounding the perimeter of the support surface; |
| a means for attaching the bed to a mounting surface in one of the first or second side wall; and |
| a storage compartment within the perimeter of the support surface, |
|     the storage compartment having a storage opening in one of the first or second side walls, and |
|     a floor spaced from the top surface, |
|     the storage compartment between the top surface and the bottom surface, |
|     the storage compartment integrally molded in the outer shell to form an enclosed space. |

Claim 6 (disputed claim terms highlighted in yellow)

| |
|---|
| 6.    The intensive use bed of claim 1, wherein the hollow outer shell further comprises a plurality of edge support beams. |

Claim 12 (amendments redlined, disputed claim terms highlighted in yellow)

| |
|---|
| 12. An intensive use bed mounted on a floor comprising: |
| a hollow molded non-penetrable outer shell for resisting penetration by fluids |
|     having a top surface, |
|     bottom surface, |
|     a pair of end walls, |
|     a first side wall and a second side wall, |
|     a support surface on the top surface, |
|     a ridge surrounding the perimeter of the support surface, |
|     the bottom surface on the floor; |
| ~~a mounting hole in the bottom surface,~~ a fastener pocket in one of the walls, |
|     a fastener hole in the fastener pocket and |

| |
|---|
| extending through the bottom surface, |
| a fastener in the ~~mounting hole, the fastener~~ fastener hole and |
| extending through the bottom surface, |
| the fastener attached to the floor; and |

| |
|---|
| a storage compartment within the perimeter of the support surface, |
| the storage compartment under the support surface |
| having a storage opening in ~~a wall~~ one of the walls, |
| a top on the top surface and a storage cavity floor, |
| the storage compartment integrally molded in the outer shell, |
| the storage compartment further comprises a sloping storage cavity floor opening into one of the walls and |
| disposed between the top surface and the bottom surface. |

Claim 15 (amendments in redline, disputed claim terms highlighted in yellow)

| |
|---|
| 15. An intensive use bed mounted on a floor comprising: |

| |
|---|
| a hollow molded outer shell |
| having an interior, |
| top surface, |
| bottom surface, |
| a pair of end walls, |
| a first side wall and a second side wall, |
| a support surface on the top surface, |
| a ridge surrounding the perimeter of the support surface, |
| the bottom surface spaced from the top surface and on the floor, |
| a plurality of openings formed in the bottom surface, |
| ~~a mounting hole in the bottom surface,~~ a fastener pocket in one of the walls, |
| a fastener hole in the fastener pocket, |
| the fastener pocket spaced from each of the plurality of openings, |
| a fastener in the ~~mounting hole, the fastener~~ fastener hole and |
| extending through the bottom surface, |
| the fastener attached to the floor; and |

| |
|---|
| a storage compartment within the perimeter of the support surface, |
| the support surface over the storage compartment being a non-penetrable outer shell for resisting penetration by fluids |
| the storage compartment having a single storage opening |
| and a storage cavity floor, |
| the storage opening formed in one of the walls, |
| the storage cavity floor between the top surface and the bottom surface. |

4

Claim 16 (new; disputed claim terms highlighted in yellow)

| |
|---|
| 16. An intensive use bed comprising: |
| a molded outer shell having |
| a top surface, |
| bottom surface, |
| a pair of end walls, |
| a first side wall and a second side wall, |
| connected to form a hollow cavity, |
| the bottom surface on the first side wall and extending to the second side wall, |
| the bottom surface further on the first end wall and extending to the second end wall, |
| the bottom surface further comprising an outer edge, |
| the bottom surface comprising a plurality of openings therein, |
| each of the plurality of openings comprising a recess in the bottom surface, |
| a support surface on the top surface, |
| the support surface having a perimeter, |
| a ridge on the top surface, the ridge surrounding the perimeter; |
| a means for attaching the bed to a mounting surface in one of the first or second side walls; |
| the means for attaching the bed to a mounting surface spaced from each of the plurality of openings; and |
| a storage compartment within the perimeter of the support surface and |
| between the top surface and the bottom surface, |
| the storage compartment below the top surface and above the bottom surface, |
| the storage compartment having a storage opening in one of the first or second side walls, and |
| a floor spaced from the top surface, |
| the storage compartment integrally molded in the outer shell to form an enclosed space. |

Claim 18 (new; disputed claim terms highlighted in yellow)

| |
|---|
| 18. The intensive use bed of claim 16, further comprising |
| a plurality of end support beams and |
| a plurality of edge support beams, |
| the end support beams in the outer shell, |
| the end support beams extending between the pair of end walls, |
| the edge support beams in the outer shell. |

### 2.   Disputed Claim Terms & The Parties' Proposed Constructions

In light of new prosecution history from the reexamination proceedings, Plaintiff asks this Court to reconsider its original construction of the term "a means for attaching the bed to a mounting surface." *See* [220] at 2. Defendants, additionally, propose five new terms to be construed. *See id.* Plaintiff argues that these five terms do not need to be construed. *See id.* The parties submitted a joint claim construction chart, [220], detailing the disputed terms and phrases (indicated above) and the parties' proposed constructions, as follows:

| Claim Term | Plaintiff's proposed construction | Defendants' proposed construction |
| --- | --- | --- |
| "a means for attaching the bed to a mounting surface" | fastener pockets along the outer bed walls, wherein each pocket contains a fastener hole extending through the bottom surface | D says we should stick with the construction we previously announced, see [109] at 10-12. |
| "a fastener pocket in one of the walls" | as-is, or, alternatively, "a recessed fastener pocket in one of the end walls, the first side wall, or the second side wall" | "an enclosure in one of the end walls, the first side wall, or the second side wall" |
| "the storage opening formed in one of the walls" | as-is | "the storage opening integrally molded in one of the walls" |
| "edge support beam" | as-is, or, alternatively, "a structure formed in the shell in the shape of a support beam, extending between the side walls" | "part of the honeycomb structure forming honeycomb walls of the openings in the bottom surface, extending between the side walls |
| "end support beam" | as-is, or, alternatively, "a structure formed in the shell in the shape of a support beam, extending between the end walls" | "part of the honeycomb structure forming honeycomb walls of the openings in the bottom surface, extending between the end walls" |
| "plurality of openings in the bottom surface" | as-is, or, alternatively, "openings in the bottom surface to improve strength and potentially reduce the weight of the bed" | "openings in the bottom surface forming a honeycomb structure to improve strength and reduce the weight of the bed" |

6

## B.    Legal Standard

A critical part of a patent infringement analysis is determining the scope of the patent claims, which define the exclusionary rights granted by the patent. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 374 (1996); *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1476 (Fed. Cir. 1998). Claim construction is a question of law to be determined by the court. *Markman*, 517 U.S. at 384.

The process of claim construction starts with the language of the claims themselves—interpreting the terms according to their ordinary and customary meaning—that is, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). A person of ordinary skill in the art ("POSA") is understood to read the claim term not just within the context of the claim where it appears, but also in light of the entire patent. *Id.* at 1313–14. Thus, courts must always begin their claim construction analysis by considering the intrinsic evidence on record including the patent claims, the specification, and the prosecution history. *Id.* at 1313–15. Indeed, the specification is often "the single best guide to the meaning of a disputed term." *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

The prosecution history, additionally, "provides evidence of how the PTO and the inventor understood the patent." *Id.* at 1317. The prosecution history can shed light on the meaning of the claim language "by demonstrating how the inventor

7

understood the invention and whether the inventor limited the invention in the course of prosecution." *Id.*

Courts may also use their discretion in relying on extrinsic evidence, although it is generally less significant and less reliable than the intrinsic record. *Id.* at 1318–19. The extrinsic record consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 1317 (quoting *Markman*, 52 F.3d at 980).

## C.  Analysis of the Disputed Claim Terms

### 1. "a means for attaching the bed to a mounting surface"

The parties first dispute the phrase "a means for attaching the bed to a mounting surface." [220] at 2. Both parties agree that this claim amounts to a "means-plus-function" claim limitation that is governed by 35 U.S.C. § 112(f). *See* [212] at 16–17; [214] at 13. This Court previously construed the term "a means for attaching the bed" as "a means for attaching a bed through the following structures: fastener pockets, *generally scalloped shaped*, along the outer bed walls wherein each pocket contains a fastener hole extending through the bottom surface." [109] at 10 (emphasis added).

The current dispute centers around whether the corresponding structure includes "generally scalloped shaped." Plaintiff seeks to amend the Court's prior claim construction to omit "generally scalloped shaped" because the reexamination proceedings support that the "fastener pockets" need not be a particular shape. [214] at 15–16. Defendants argue that no new construction is needed. [212] at 15. Based

8

upon the new prosecution history, the Court agrees with Plaintiff.

The Court is permitted to reconstrue this term in light of the reexamination proceedings. Claim construction orders are interlocutory rulings, and therefore, they may be revised by a district court before final judgment is entered. *See* Fed. R. Civ. P. 54(b). A district court may also engage in "rolling claim construction," by revisiting and altering its interpretation of a claim term "as its understanding of the technology evolves." *Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002); *e.g.*, *Bone Care Int'l, LLC v. Pentech Pharms., Inc.*, 2010 WL 3023423, at *1 (N.D. Ill. July 30, 2010) (revisiting claim construction after prior construction order). Indeed, when reexamination proceedings result in new prosecution history, district courts may reconstrue disputed claim terms that have been altered by the reexamination. *See Lexington Luminance LLC v. Amazon.com Inc.*, 601 F. App'x 963, 970 n.5 (Fed. Cir. 2015); *see, e.g.*, *MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 2018 WL 4616255, at *6 (N.D. Cal. Sept. 26, 2018) ("To the extent that the file history changed as a result of the ex parte reexamination and there is an actual dispute between the parties, the Court must reconsider claim construction").

In construing a means-plus-function element, the Court identifies the claimed function, then determines "what structure, if any, disclosed in the specification corresponds to the claimed function." *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1266 (Fed. Cir. 2021) (citing *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351 (Fed. Cir. 2015)). The function recited in the '933 Patent remains undisputed: "a means for attaching the intensive use bed to a mounting surface." [109] at 9.

Under step two, the structure disclosed in the specification constitutes the "corresponding" structure "only if the specification or prosecution history clearly links or associates that structure" to the described function. *B. Braun Med., Inc. v. Abbott Lab'ys*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). Indeed, "structural features that do not actually perform the recited function do not constitute a corresponding structure." *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001). When construing a means-plus-function term courts should not import "structural limitations from the written description that are unnecessary to perform the claimed function." *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001).

The parties dispute whether the scope of the corresponding structure should include the limitation "generally scalloped shaped." In either scenario, the specification expressly describes this structure. *See, e.g.*, [31-1] at 17, 18. The critical issue is whether the specification or the prosecution history *links* the structure's shape to the recited function, and the Court finds that neither the specification nor the prosecution history link the scallop shape of the fastener pockets to the recited function.

Indeed, the examiner's amendments during the reexamination proceedings confirm that the "generally scalloped shape" of the fastener pocket is unnecessary to perform the recited function. The examiner allowed claim 16, a means-plus-function claim, because the prior art does not disclose a "means for attaching the bed to a mounting surface," wherein the corresponding structure is "a plurality of fastener

10

pockets 32." [211-5] at 264. The plurality of fastener pockets was thus sufficient to overcome the prior art. The examiner similarly allowed the amendments to claims 12 and 15 for the same reason. [211-6] at 292. Notably, claims 12 and 15 claim only "a fastener pocket," and do not claim the shape of the fastener pocket. Because the shape of the fastener pockets was unnecessary to overcome the prior art, the fastener pockets need not be "generally scalloped shaped" to perform the claimed function. *See Wenger*, 239 F.3d at 1233.

To be sure, the examiner also allowed new claim 19, which depends from claim 16 and recites "the intensive use bed of claim 16, wherein the means for attaching the bed to the mounting surface comprises a plurality of fastener pockets, each fastener pocket comprising a mounting hole in the bottom surface, the fastener holes spaced from the recesses in the bottom surface." [211] at 14. This claim defines the fastener pockets as the corresponding structure of the means-plus-function claim 16, and does so without referring to the shape of the pocket. Dependent claims cannot be broader than the claims from which they depend. *See Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1445 (Fed. Cir. 1997) ("we must not interpret an independent claim in a way that is inconsistent with a claim" which depends upon it). For these reasons, the Court declines to construe claim 16 as including the limitation "generally scalloped shaped" and reconstrues "a means for attaching the bed" as a means for attaching a bed through the following structures: fastener pockets along the outer bed walls wherein each pocket contains a fastener hole extending through the bottom surface.

11

2. "a fastener pocket in one of the walls"

As a result of the reexamination proceedings, claims 12 and 15 were amended to claim, "a fastener pocket in one of the walls." [211] at 14. Defendants argue that the term "fastener pocket" should be construed as an "enclosure" and submits that the pocket "must be subsidiary to, and recessed within, the wall it is in, and is not the entire wall in and of itself." [212] at 6. Plaintiff, on the other hand, argues for the plain and ordinary meaning, or alternatively, adding the term "recessed" before "fastener pocket." [220] at 2. In construing the claim, the Court maintains "an independent obligation to construe" the disputed terms, and "need not accept the constructions proposed by either party." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1323–24 (Fed. Cir. 2008). In this regard, the Court considers: (1) what a POSA would understand "pocket" to mean; and (2) the extent to which "in one of the walls" modifies "fastener pocket."

Initially, this Court finds that the term "pocket" remains unambiguous. Plaintiff correctly points out that replacing "fastener pocket" with "enclosure" does not clarify the meaning of the claim. The intrinsic record does not support this construction; the patent itself does not even contain the word "enclosure." Further, Defendants cite no support from the record that a pocket must be "recessed deeply within the substrate materials," or that it must be "small." To the extent Defendants attempt to limit this claim term to the embodiment depicted in the figures, the attempt fails, as the patent does not clearly limit the fastener pockets to a particular size. *See Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371–72 (Fed. Cir.

12

2014) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction'") (citation omitted).

The claim term read as a whole, "a fastener pocket in one of the walls," clarifies the pocket's location and relationship to the rest of the wall. As the claim itself states, the pocket must be "in" one of the walls, [211] at 14, and therefore remains separate from, and necessarily smaller than, the wall itself. The element "fastener pocket" would be superfluous if it could constitute the separately claimed walls. The pocket must be contained within or formed in the wall it is in and cannot fully define or replace that wall.

This construction remains consistent with the other uses of the term "pocket" in the specification. For example, the specification describes the invention as having a "top surface 22" with "a ridge 33 surrounding the support portion 35 forming a recessed pocket on the top of the bed." [31-1] at 17. The "ridge 33" and the "support portion 35" form a "recessed pocket," which Plaintiff notes covers "nearly the entire top surface of the bed," [214] at 24, but not the entirety of the structure in which it sits. Accordingly, this Court construes "fastener pocket in one of the walls" to mean: a fastener pocket within, and not fully defining, one of the end walls, the first side wall, or the second side wall.

Following the claim construction hearing, the parties submitted supplemental briefs concerning the impact of Plaintiff's appellate positions in the reexamination

13

proceedings on their claim construction arguments here. *See* [229], [230], [234]. In their brief, Defendants argue that, in its reexamination appellate brief, Plaintiff made several statements concerning the scope and meaning of the term "in one of the walls" that bear on the Court's construction today. *See* [229]. For example, Defendants argue, Plaintiff stated in its appellate brief that no part of "flanges flaring outward from the side and end wall" is "disposed in a side wall or end wall"; this demonstrates, according to Defendants, "that the claimed 'fastener pockets in one of the walls,' which Norix alleges comprise the entire side wall of the accused beds"— that is, the entire side wall panel and not just the storage compartments within the side wall panel—"were never contemplated to comprise this overall structure, that is, a flange that flares out from the wall itself." [229] at 3–4. According to Defendants, "Norix went on to say, 'there are also flanges along the other edges of the shell,' SA017, again reinforcing that this specific structure is and always was walls with outward-flaring flanges, and not the inverse of pockets in the walls." *Id.* at 4.

But, as Plaintiff pointed out in response to Defendants' supplemental brief, no one is arguing that the pocket constitutes the entire wall, *see* [234] at 2–3; the real question is whether a "fastener pocket" must be small relative to the wall or whether it could also be large. Based upon the Court's construction above, the pockets may be any size, so long as they are smaller than, and do not constitute the entirety of, the wall in which they sit.

3. "the storage opening formed in one of the walls"

Claim 15, as originally issued, claimed "the storage opening formed in one of

14

the walls." [31-1] at 20. The amendments to claim 15 during the reexamination proceedings did not alter this claim term. Defendants propose to define this phrase as "the storage opening *integrally molded* in one of the walls." [220] at 2 (emphasis added). This Court previously construed the term "integrally molded," which appears in claims 1 and 12, to mean: "molded as a single complete unit within the outer shell." [109] at 16. Plaintiff argues that "formed in" includes the Court's prior construction of "integrally molded," as well as separately formed structures that are attached to the bed. [214] at 21.

Even though Defendants did not seek construction of this claim term initially, the Court may engage in "rolling claim construction." *Jack Guttman*, 302 F.3d at 1361. Because the "storage compartment" element and its subcomponents are claimed differently in claims 1, 12, and 15, clarification makes sense as to whether certain modifications (such as whether the storage opening is "integrally molded") also apply to claim 15.

But Defendants' proposed construction violates the doctrine of claim differentiation, pursuant to which the terms "formed in" and "integrally molded" must have distinct meanings. Under the doctrine of claim differentiation, "it is presumed that different words used in different claims result in a difference in meaning and scope for each of the claims." *Clearstream Wastewater Sys., Inc. v. Hydro-Action, Inc.*, 206 F.3d 1440, 1446 (Fed. Cir. 2000). The term "integrally molded" appears in claims 1 and 12, but not in independent claim 15. Reading that limitation into claim 15 would improperly eliminate the distinctions between the

15

claims.

In *Mycogen Plant Sci. v. Monsanto Co.*, 243 F.3d 1316 (Fed. Cir. 2001), the plaintiff argued that the district court's construction of one claim term rendered it synonymous with a different claim term, thus making one of the claims superfluous. *Id.* Relying on the doctrine of claim differentiation, the Federal Circuit rejected the plaintiff's argument and affirmed the district court's construction of both claim terms, finding that they constituted separate, independent claims and noting that it was "not unusual" for separate claims to "define the invention using different terminology, especially where (as here) independent claims are involved." *Id.* at 1329. In *Mycogen*, the prosecution history supported the finding that the two limitations were distinct, as independent claim 7 could be satisfied even when claim 1 was not, due to the differences in the two disputed claim terms. *Id.*

Here, as in *Mycogen*, claims 1, 12, and 15 are separate, independent claims. Additionally, the specification supports that "formed in" has a distinct meaning and scope from "integrally molded," as it uses these terms to refer to different embodiments and components. For example, the specification discloses that "a fastener hole 40 is formed in the fastener pocket 32," [31-1] at 17 (4:34 –36), and a "plurality of fastener holes 76 formed in the base 78," [31-1] at 18 (5:23–24). A hole, being negative space—an absence of material within the pocket—cannot be "integrally molded" consistent with this Court's prior construction of the term. *See also* [31-1] at 17 (3:61–62) ("The bed 20 has an attachment means 27 formed in the end, rear and front walls"); [31-1] at 17 (4:30–32) ("the outer walls 24, 26 may have

16

contoured ridges 37 formed in the surface to provide ridges for support of the walls"); [31-1] at 17 (4:49–50) ("The mounting flange 46 is formed in each of the fastener pockets 32"). In contrast, the term "integrally molded" appears in the specification only twice outside of the claims, relating to separate embodiments and components. *See* [31-1] at 18 (6:33–34) ("The writing surface may also be integrally molded with the legs 124"); [31-1] at 19 (7:21–27) (referring to a wardrobe embodiment, "an integrally molded sloped top surface 193"). This further supports the proposition that these two claim limitations remain distinct. Accordingly, the Court declines to adopt Defendant's proposed construction for "the storage opening formed in one of the walls," and instead agrees with Plaintiff that no further construction is required.

4. <u>"edge support beam" and "end support beam"</u>

Claim 6, which depends from claim 1, and claim 18, which depends from claim 16, both recite "edge support beams." [31-1] at 20; [211] at 14. Claim 5, which depends from claim 1, claim 7, which depends from claim 6, and claim 18, which depends from claim 16, all recite "end support beams." [31-1] at 20; [211] at 14. Defendants construe the support beams as part of the "honeycomb structure" and seek the following construction: "part of the honeycomb structure forming honeycomb walls of the openings in the bottom surface, extending between" the "side walls" (for edge support beams) or the "end walls" (for end support beams). [212] at 10. Plaintiff argues that Defendants improperly seek to characterize the support beams as necessarily part of the "honeycomb structure." [214] at 28. Plaintiff contends that the Court need not construe these terms, and the plain and ordinary meaning should

17

prevail. [214] at 29–30. This Court agrees with Plaintiff.

Nothing in the specification suggests that the end support beams and the edge support beams must be confined to the honeycomb structure. Although the specification indicates that the "honeycomb structure 38 comprises a plurality of end support beams 47 extending between the end walls 24" and "further comprises the plurality of edge support beams 42 extending between the front walls 26 and the rear walls forming a plurality of chambers 43 (FIG. 6) enclosed in the shell of the bed and open recesses 36 opening to the bottom surface 34," [31-1] at 17 (4: 22–29), the claims demonstrate that the beams can also exist independently. For example, although claim 4, which depends from claim 1, recites the "intensive use bed of claim 1, where the bottom surface further comprises a honeycomb structure," claims 5 and 6, which also depend from claim 1, recite the intensive use bed "wherein the hollow outer shell further comprises a plurality of end support beams" (claim 5) or "a plurality of edge support beams" (claim 6). [31-1] at 20. Claims 5 and 6 do not reference the honeycomb structure at all. As a result, the beams are not inherently tied to the honeycomb structure and may stand alone.

Finally, the terms "edge support beam" and "end support beam" remain unambiguous. Fig. 2 shows a clear embodiment of what the support beams look like. Indeed, both parties agree that the edge support beams extend between the side walls and the end support beams extend between the end walls. [220] at 2. The Court thus agrees with Plaintiff that "end support beams" and "edge support beams" require no construction to be given their plain and ordinary meaning and declines to construe

18

these two disputed claim terms.

5. "plurality of openings in the bottom surface"

Relatedly, Defendants also seek to impose the honeycomb structure on the claim term "plurality of openings in the bottom surface," which appears in independent claim 15, [211] at 14. Claim 16, a new independent claim resulting from the reexamination proceedings, also recites a "bottom surface…the bottom surface comprising a plurality of openings." *Id.* Claim 17, which depends from claim 16, recites "the intensive use bed of claim 16, wherein the plurality of openings in the bottom surface comprise a honeycomb structure whereby the structural strength of the bed is improved." *Id.*

Defendants propose to construe this term as "openings in the bottom surface forming a honeycomb structure to improve strength and reduce the weight of the bed." [212] at 10. Again, Defendants improperly seek to import the "honeycomb structure" limitation into the claims set forth above. The Court rejects this construction.

The doctrine of claim differentiation "prevents the narrowing of broad claims by reading into them the limitations of narrower claims." *Clearstream*, 206 F.3d at 1446. In *Clearstream*, the Court declined to read the "flexible-hose" limitation of a dependent claim into the broader independent claim that did not specify the "type of aerating system" to be used. *Id.* at 1446–47. Similarly, here, Defendants' proposed construction violates this principle by rendering certain claims superfluous. Claim 17 would become redundant if its limitations were imported into claim 16 by

19

construing "the bottom surface comprising a plurality of openings," [211] at 14, as Defendants have proposed. Similarly, Defendants' proposal makes claim 4 redundant. Because the claim terms, as written, remain unambiguous, the Court finds no construction is necessary for the term "plurality of openings in the bottom surface."

**D.      Conclusion**

For the foregoing reasons, the Court construes the relevant claim language as set forth above.

Dated:  March 25, 2026

Entered:

John Robert Blakey
United States District Judge

20